Good morning, Your Honors. Holly Boyer on behalf of plaintiff Patricia Samson. Your Honors, I'd like to reserve three minutes of my time for rebuttal. Please watch the clock. Your Honors, the District Court's order granting summary judgment in favor of Wells Fargo as to plaintiff's claim for disability discrimination deprived plaintiff of any chance of being able to present her case to a jury, which was an error. Viewing the evidence and inferences therefrom collectively, and construed in the light most favorable to Ms. Samson as opposed to her employer, Wells Fargo, the evidence is such that a reasonable juror could conclude that Samson was wrongfully terminated and that the supposed legitimate business reason was mere pretext. I'd like to focus on the pretext issue, as that is the primary issue before this Court. Your Honors, within days of plaintiff informing her employer that her doctor has placed her on medical disability leave, Wells Fargo decided to terminate plaintiff. They argue it has nothing to do with disability, but the evidence and inferences tell a different story. One, the documents themselves that we have reveal that plaintiff emailed her supervisor, Jason Gwynn, on Monday, October 27th, saying, I'm staying home today, I'm not feeling well. There's an exchange about her seeing her doctor. She informs him, as well as two other managers that are copied on the email on Tuesday, October 28th, saying, I'm going to be taking a medical disability leave until December 1st. Then we know the very next day, within 24 hours, there is an Outlook invite, an invite for a meeting with Gwynn's supervisor, Sweeney, subject matter being Samson's displacement, and the subject stating, quote, I want to run an idea by you regarding Patricia Samson. Within days of that Outlook, there was a formal email outlining a plan to eliminate her position and terminate her, and approval of that plan. Based on these documents, there is a connection, at least one that a juror could find, between her disability and the decision to terminate her. Defendants have taken the position that, instead, there was a discussion on October 13th and another one on October 21st, predating when Gwynn knew of plaintiff's disability as to the reason to terminate her. But the evidence reveals, collectively, that there's holes in that story. There are issues with that story. There is, one, we have no documents to support that there was this conversation on 10-13 between Gwynn and Sam, nor on 10-21 between Sweeney and Gwynn. And instead, when you actually look at the documents we do have, they suggest there's no reference to any prior conversations. So is the theory that the I-want-to-run-an-idea-by-you email or Outlook invite, that that establishes, or at least could be found to establish, that the prior conversations, the October 13th between Gwynn and Sam and the October 21st between Gwynn and Samson, that they didn't happen or that they just didn't matter as much? I think that it suggests, to say I-want-to-run-an-idea-by-you, suggests that they haven't previously talked. So their argument, as I understood it, was that the question was whether they could continue with their plan when she was on leave. In other words, could they replace the PM1 position with a PM2 position while she was on leave? So that's their testimony. So was there evidence that that was not what they discussed? Well, it doesn't seem to line up, and I think that the biggest— Was there evidence, or are you saying that you infer that that's not what they said? So I don't believe—if you look at the evidence we do have, which are the hard emails and the Outlook invitation, the emails that went out, the formal email that went out on October 30th, I believe, from Gwen to Sweeney asking for permission to do this, doesn't reference whether or not— Can we still effectuate our plan that we've already discussed now that she's on medical leave? Right. So we have the testimony of the parties, and I think what Judge Connelly asked was, are you saying we should infer that that never happened because we have the testimony of the various parties, and that is evidence just like the emails are evidence? It is, and I think that this is when we have to view the issue in the context, as this court, the Ninth Circuit, has repeatedly said, when you have an employment discrimination claim and you're at this element of pretext, inferences— intent is very hard to prove, especially in a discrimination case. So any inferences from the evidence must be resolved in favor of the employee at this point. A jury could find otherwise. There's an email that says, if our business plan works only if I have a commitment to hire a PM2, if unable to hire a PM2, we will continue to work with Patricia. So how are we to take that as part of this line of inferences? I think that could be an inference in favor of plaintiff. Why is that? Because there was no performance issues with Patricia Samson. The district court highlighted in its order— So doesn't that indicate after she went out on medical leave that they were willing to continue to work with her if they couldn't get their PM2 plan in? I think the opposite inference can be drawn is that once she says she's going on medical leave, they're now raising some issue with her performance, which has never been raised before. So it almost looks like more of a cover-up or more of a reason why they're now deciding to terminate her when they're saying we'll work with her as to performance issues when there has never been any record of performance issues with Patricia, with Ms. Samson. But you do have to infer that they're referring to performance issues, right? As opposed to being out on leave, say. From that email, there is a reference to we'll continue to work with her. But I think that— In spite of the fact that she won't be here for a substantial period of time. I mean, isn't that a reasonable interpretation of that? Well, I think, yes. And I think an inference from that— There's two inferences that could flow from that. One is that they will continue to work with her, suggesting that they wouldn't fire her for her disability, which I think would be in favor of Wells Fargo. And then there's an inference that since they've never had any discussions about her job performance, and they themselves and the district court highlighted this in its order at the excerpts of record, page 18, that—excuse me, on page 17—that plaintiff's job performance played no role in this decision to terminate or this restructuring. And so I think the equal inference, and again, viewing this in the context that we are supposed to look at this evidence, is that the inference is they're all of a sudden talking about her performance issues when this has never been the issue. Do you want to save time for rebuttal? Yes, definitely, Your Honor. We'll hear from the others after this. Good morning, Your Honors. Thomas Kaufman for Wells Fargo. I think it's important to step back a second and look at what was happening before October. In this office, they were having an issue. They needed more staffing. They had more work that was coming in. They needed to be more— their original plan had been to hire a second PM1, so basically they had more work coming in. That never changed. There's no evidence that the work actually went down. There was an impediment that was risen in the beginning of October that a new head, John Adams, that he put a temporary hold, indefinite hold, on increasing the number of FTEs, full-time equivalents. So they needed to find some way to be able to do this additional work while staying within the staffing model of the same number of people. And that is where, on October 13th, there was initial discussion between Jason Gwin and Kim Pham of HR. There's no dispute of this in the sense of they're not disagreeing with each other. There's not some other witness who says it didn't happen. It's unrebutted testimony that they had a discussion on the 13th about an idea originally between them of how to deal with this by hiring a more qualified person, in the sense of not necessarily like a better performer, like you got a 2 instead of a 3 on your own review, but someone who was able to handle more complex transactions, would be a higher wage job, $125,000 versus $100,000. So you say unrebutted. How is somebody supposed to rebut testimony from people that work for one side of the case? I mean, unless they bug the room or something like that. How are they supposed to rebut it? Isn't the way you rebut it by showing that there's other circumstantial evidence that suggests that things didn't happen that way? Yes. I mean, there's circumstantial evidence and there's speculation. In any case, I could say everybody's telling lies. Here, the one piece they claim is that their only piece of evidence that's supposed to rebut anything is that there is a calendar invite on the 20th. Let me run something by you or something like that. Let me run an idea by you. We've explained that, and again, all the witnesses are consistent. One way you get past summary judgment is showing inconsistencies between the witnesses. The witnesses testified they found out on the 27th that she was going on leave. As is typical in business, there's a question of whether you can actually eliminate someone's position when they go out on leave. I've had cases up in this court addressing that very issue. They consulted with HR. HR then ran it up to a higher HR person, an employee relations consultant, who said, no, you can go ahead. This idea you want to run by was going and doing a termination even though she was out on leave because HR had approved it. Again, there's no question that there were conversations with HR, and there isn't, by the way. When you say there's no question, I mean, it just seems to me that all of the witnesses are on one side of the case. When you say there's no question, you're basically saying, well, you've got to believe everything they say because nobody says the opposite. I mean, isn't the point here that when Gwen writes the email on the 29th and says, let me run an idea by you, that would suggest to a reasonable person that this is the first time they're talking about it, and they didn't really talk about it eight days before, which is what he testified. He said, I want to run a new concept by you that we've never discussed before, but idea is... It's an email subject line, not a treatise. Well, no, it's actually a calendar invite. It's a calendar invite. Well, okay, fair enough. Same point, same difference. I think that what's important about it is that in the overall context, nobody is contradicting one another. The fact that you could possibly infer, you could infer anything from that. It's not like there's anything in there that says, this is something we've never discussed before. So basically what you're saying is that if all of the witnesses on one side of the case testify consistently, then that's kind of the end of the story because none of them contradicted each other. Well, I would say, if you have to look at the other evidence around it as well, the other evidence is there was an increased need in staffing. They had actually interviewed back in July and had hired somebody, had planned to hire somebody for this position that got put on hold, that they had this continued need. They did, in fact, replace her with a PM2. Everything isn't consistent to the story that this is what we were planning to do and this is what we did. Except for the fact that when they fired her, Gwen told her that it was all performance related, didn't say anything about the reorganization. So there's an inconsistency. I think that's a mischaracterization of the record on some level, Your Honor. They said that they needed to have, to bring in somebody, which they did, a PM2, to be able to handle this more sophisticated workload that the PM2 job could. And you couldn't just give her a new job title and have her suddenly change. She was performing at a three level, which is competent. No one's saying she got fired for being incompetent, but she was a competent level three PM1 when they needed to increase their efficiency and bring in a PM2, which is exactly what they did. I mean, there's not any kind of comments, anybody saying, any kind of comments about disliking disabled people. There's no evidence that she told anybody she needed to leave until the 28th. I mean, remember, within two days in a large business organization, they have a business plan written, they have, you know, sent up to a higher level person. Things just don't work that fast in the business world. The business plan is the October 30th email? The one that was sent that was filed for John Adams. I mean, there's nothing particularly complicated about that. It's like a two-paragraph email. Are you thinking about how much you're going to pay somebody? These things don't just happen. You're saying that Mr. Gwynne couldn't figure that out in two days? Yeah, I think in a complex way. I mean, to me that kind of sounds like a great argument to make to a jury, but when the inferences are all supposed to be drawn in the way opposite from you, that's not really what we're talking about here. I don't think there's any case law, any sort of fact, that there's not something that was, you know, a specific memo that was written earlier. We're not saying that. But you're saying that the fact that there's something that says, I want to know an idea about it, which is explained. There is an explanation of that, that there was an event that happened intervening between their two conversations. There was, in fact, communication with HR and with the ERC, and there's nothing that shows that any of this happened. Well, what do we do about the statement in the October 30th email that says, it's the business plan that says, if we don't get to hire a PM2 then we'll continue to work with Patricia? And opposing counsel says, well, that actually shows that they were inventing a performance issue. But it seems to say that they'll continue to work with Patricia. There had been a hiring freeze. They wanted to hire a second PM1. There had been a hiring freeze that thwarted them from hiring a second PM1. They wanted to, ideally, get someone who could, with a higher skill level, that could handle this larger workload. But if they couldn't do that, then they would work with her to try to improve her skill level up to that, like a PM2. But she wasn't that. There's nothing that says they invented a performance problem. She was, on her reviews, she had reviews of three. There's testimony that's, again, unrebutted. You said three is average? Three is average. There's other people in the group who were rating it fours. So she was an okay performer. She wasn't about to be fired for being a bad performer, but she wasn't at the PM2 level. However, if life gives you lemons, make lemonade. If you're stuck with the workforce you have, I'm going to continue to try to work with her to bring her up to. So this was written after? She left on medical leave? Is that right? She announced her medical leave on the 27th, I believe, they received the warning. Okay. The case that they rely on about this notion that, well, the fact that there is no document that says it's going to happen is evidence of discrimination. It was a very different case. The McGinnis case involved where there was a large company-wide hiring freeze and there was no evidence of the need for the freeze, there was no evidence there had ever been a discussion of the freeze, and there was contradictions of whether there really was a freeze. Here, there's no contradiction whatsoever that they had a need, that they changed the staffing, that they eliminated her position, and they brought in a higher-level person. And all they really have is timing and this one-word idea, and I just don't think that is enough to raise a reasonable inference that all of this was motivated. This incredibly complex 5, 6 people all lying with no evidence that they're lying all happened following from getting an email on the 28th. The last thing I would say is, unless there are other questions, there is some documentation. On the 13th, Mr. Gwinn testified that he had a calendar entry on a meeting with Ms. Phan. He went back and looked at his calendar, and that triggered that that was the same day that they had their conversation initially about this. And on the 21st on his calendar showed that he was out of his office, out of his home, I mean. He had to move out for some issue, and that, remember, that's when he had his first conversation with Mr. Sweeney. So, again, there's some documents. And usually what they say to avoid summary judgment, you have to show contradictions, implausibilities, dissembling. There's none of that. All the witnesses have testified, and they've been cross-examined, that things happened the way they did. In other words, I think this is just really speculation, which shouldn't be enough. Thank you. We have some time for rebuttal. I want to pick up on the first thing Council mentioned, which is the actual justification. This idea that they're eliminating plaintiff and this other PM1 position and going to hire a PM2 to save the company $75,000. The problem with this justification is that, as Council explained, that was approved in July 2014. They interviewed candidates. They found a candidate. Gwen said he found a candidate and proposed it late September. And the week of October 6th, this is on the record at page 408, Gwen was told he asked for permission to hire. He was told at that time, quote, I was told that we weren't allowed to fill the position and that I needed to cancel it. He also testified, quote, I'm not sure whether it had been formally canceled in the system, but my understanding was that I could not hire that position. And that's at the record at 81 to 82. So at this time, there is no second PM1 position. The justification that they're going to fire plaintiff and get rid of this opening for this PM1 position to save the company money and hire a PM2 doesn't make sense. The opposing counsel says they did, in fact, hire a PM2. Is that correct? You know, the district court ruled that evidence inadmissible, and there was nothing in the paper saying that should be admissible on appeals. So it's my understanding that that was not a consideration by the court, nor it should be. So what I want to focus on is just this idea that they keep saying, oh, this was all for this specific reason. It had nothing actually to do with performance. They didn't get approval because they sent a business plan, and I thought they got approval. They did. Adams approved the business plan on November 1st. That's correct. And that was to replace the PM1 with a PM2. Is that correct? That's correct. And that all happened after they knew that plaintiff was leaving for disability. So what do we do about the language saying that if we don't get the PM2, then we'll continue working with Patricia? I mean, again, I think that inference leads in our favor. Well, no, just please explain that because it says we know she's disabled at that point, but if we can't get our business plan of replacing a PM1 with a PM2, then we'll continue to work with her to get her performance to be equivalent to a PM2, presumably. Well, that's their characterization. Well, isn't that continue to work with Patricia? I don't know how else to characterize that. How else should I characterize that? They're continuing to work with her after she's out on disability. To me, the way that a reasonable juror can interpret that e-mail is to say, if I don't get a PM2, I will continue to work with Ms. Sampson, suggest that it is problematic. There are issues with Ms. Sampson. Okay, thank you. With my last few seconds, I just want to... You're out of time, so please just wrap it up. I just want to say, collectively, when you look at the temporal connection in time, when you look at the actual documents that we have that tell a story of a termination right after describing the medical leave, when you look at the lack of documents supporting their argument, and you look at the lack of a justification, this tells a story that the jury needs to be able to resolve, not as a matter of law. Thank you. Thank you. Thank you for your arguments. The case of Patricia Sampson v. Wells Fargo is submitted.
judges: Tashima, Ikuta, Kennelly